THE HONORABLE KYMBERLY K. EVANSON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| OLYMPIC VIEW WATER AND SEWER DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>EDMONDS SCHOOL DISTRICT NO. 15,<br><br>Defendant. | Case No.<br>2:25-CV-01409 KKE<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>**NOTED FOR HEARING: MONDAY, APRIL 13, 2026** |

## I.      INTRODUCTION AND RELIEF REQUESTED

Plaintiff Olympic View Water and Sewer District ("OVWSD") is a public water district that serves thousands of residential customers in Snohomish County. To further its mission to provide safe drinking water to its customers and its statutory mandate to "provide for the reduction, minimization, or elimination of pollutants" from the waters of Washington State, RCW 57.08.005(10), OVWSD opposed Defendant Edmonds School District No. 15's ("ESD") decision to inject stormwater directly into the Deer Creek Drinking Water Aquifer, a major source of water for OVWSD's system.

In 2018, two years prior to construction of the Madrona K-8 School, OVWSD and ESD agreed to enter a Water Service Connection Agreement. The scope of the agreement was heavily negotiated and quite limited. ESD agreed to conduct periodic groundwater and

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 1
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

stormwater sampling for a negotiated set of analytes with then-known groundwater quality standards and analytical methodologies. The agreement does not include Per- and Polyfluoroalkyl Substances ("PFAS")—the pollutants at issue in this litigation—because in 2018, PFAS were not regulated under the Safe Drinking Water Act ("SDWA") or its state analog, PFAS did not have approved testing methods, and PFAS lacked regulatory standards to evaluate the risk it posed to human health. Moreover, nothing in the Water Service Connection Agreement speaks to ESD's obligations to comply with federal law. This citizen suit is, in this regard, entirely independent and unrelated to ESD's contractual obligations in the agreement, which OVWSD does not allege ESD has breached.

OVWSD's fears about ESD's injection wells proved to be well founded when PFAS chemicals were detected in ESD's stormwater in 2022. Following their discovery, OVWSD repeatedly attempted to engage with ESD to discuss a solution to this problem. Notwithstanding the Water Service Connection Agreement's requirement that the parties engage in direct communications to resolve disputes related to it, ESD rejected every effort OVWSD made to engage in a dialogue about PFAS on the property over the course of several years. In fact, ESD took affirmative steps to sideline OVWSD from the conversations it was having with Department of Ecology ("Ecology") to address the dangers caused by PFAS potentially reaching the aquifer through its injection wells. Because ESD roundly rejected OVWSD's overtures to discuss its concerns in good faith, OVWSD provided ESD with the statutory 60-day notice of intent to sue under the SDWA to protect the public's and its customers' interest in safe drinking water. Dkt. # 1-1.

It was not until after receiving the notice that ESD began making gestures at the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 2
2:25-CV-04109-TLF

141152\292259\50486640.v2

alternative dispute resolution process that it had already rejected. Due to ESD's continued foot-dragging, the parties did not even reach out to potential mediators to inquire about their schedules before the 60-day notice period expired.

Accordingly, ESD's Motion for Summary Judgment should be denied. In the event that the Court finds that the alternative dispute provisions of the agreement apply to OVWSD's claims and have not been met, a short, time-limited stay to conduct a mediation would be the appropriate remedy, not dismissal as requested by ESD. The need for the Court to retain this case is all the more pressing because sampling since the initiation of this case shows that Madrona K-8's stormwater continues to contain unhealthy levels of PFAS chemicals that threaten OVWSD's drinking water supply.

## II.    BACKGROUND

### A.    OVWSD's Efforts to Protect the Deer Creek Drinking Water Aquifer.

OVWSD supplies water to approximately 15,000 water service customers in unincorporated Snohomish County, the Town of Woodway, and parts of the City of Edmonds. Dkt. 26-6 at 4. It operates a municipal drinking water treatment plant that treats about 600,000 gallons per day of water drawn from Deer Creek, which accounts for roughly 40 percent of OVWSD's total water supply. *Id.*

The ESD owns the Madrona K-8 School, which is located within the Critical Aquifer Recharge Area for the Deer Creek Drinking Water Aquifer. Dkt. 17-2; Dkt. 26-6 at 4. In late 2016, OVWSD learned that ESD planned to discharge stormwater from the Madrona site through a network of 16 Class V deep injection wells, also referred to as underground injection control or "UIC" wells. Dkt. 9-1 at 1. In planning the development of the Madrona K-8 School,

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 3
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

ESD designed a stormwater management system that collects stormwater and channels it to a series of bioretention planters, an oil water separator, or one of the 16 UIC Wells located at the site. Dkt. 17-2 at 12–13. These wells inject stormwater into the vadose zone of the unconfined Qva Deer Creek Drinking Water Aquifer. Dkt. 26-6 at 4. Models indicate that water injected at the school's UIC wells will reach OVWSD's treatment plant in approximately 13 years. *Id.*

Because Deer Creek is a major source of OVWSD's drinking water, OVWSD objected to the use of UIC wells at the Madrona K-8 site out of concern that infiltrating stormwater pollutants would threaten both water quality and public health. *See generally,* Dkt. 17-2. The parties ultimately entered into a Water Service Connection Agreement on September 5, 2018. Dkt. 9-1 ("Water Service Agreement") .In the Water Service Agreement, the parties recognized Ecology regulatory standards for construction of "New Class V UIC wells used for stormwater management," but agreed to "implement additional measures to safeguard against contamination and to take reasonable measures to monitor the potential for adverse impacts to the drinking water supply and to require proactive measures before harmful impacts occur." *Id.* at 2, ¶ M. As a condition of receiving water from OVWSD, ESD agreed to "formally adopt and comply" with a series of monitoring plans included in an appendix. *Id.* at 4. Those plans required ESD to monitor groundwater for a specific, negotiated list of analytes with measurable groundwater quality standards contained in Washington regulations. *Id.* at 16–18. The monitoring plan further states that the groundwater and stormwater monitoring would "demonstrate that the Project on-site stormwater management approach does not endanger the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 4
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

Qva regional aquifer [.]"[1] *Id.* at 10. Notably, PFAS are not among the analytes or standards included under the Water Service Agreement so there are no "additional measures to safeguard against contamination" that are relevant to PFAS. *Id.* at 2, 10.

In 2018, PFAS was not subject to any enforceable regulatory scheme with quantifiable standards. It was not until 2021 that EPA compelled public water systems, like OVWSD, to sample their systems for specific PFAS chemicals under the "Unregulated Contaminant Monitoring Rule" provided by the SDWA to inform future federal regulatory action. 86 Fed. Reg. 73131 (December 27, 2021). In January 2024, EPA adopted analytical methodologies approved that previously did not exist for PFAS. U.S. EPA, Method 1633A[2] and U.S. EPA, Method 1621.[3] Without the analytical methodologies, there was no standardized way to measure PFAS. In April 2024, EPA adopted national drinking water standards under the SDWA called Maximum Contaminant Levels for certain PFAS chemicals. 89 Fed. Reg. 32532 (April 26, 2024). In May 2024, EPA designated PFAS chemicals as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 89 Fed. Reg. 39124 (May 8, 2024). None of these regulatory standards could have been contemplated by the Water Service Agreement. As a result, the monitoring analytes, frequency, locations, and analytical methodologies in the Water Service Agreement do not contemplate PFAS because such standards did not exist at the time.

---

[1] By referencing this assertion in the Shannon and Wilson Report, OVWSD does not now concede that it is accurate as reflected by the current risk to drinking water posed by the presence of PFAS in stormwater.

[2] Method 1633, Revision A Analysis of Per- and Polyfluoroalkyl Substances (PFAS) in Aqueous, Solid, Biosolids, and tissue Samples by LC-MS/MS.

[3] Method 1621, Determination of Adsorbable Organic Fluorine (AOF) in Aqueous Matrices by Combustion Ion Chromatography (CIC).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 5
2:25-CV-04109-TLF

141152\292259\50486640.v2

**B.**    **Sampling Confirms PFAS from the Madrona K-8 School Pose a Threat to the Deer Creek Drinking Water Aquifer**

Stormwater samples collected in 2022, 2023, and 2024 from the school's stormwater management system confirmed the existence of PFAS chemicals that threatened the Deer Creek Drinking Water Aquifer. Dkt. 26-6 at 4–7. On August 16, 2024, Ecology issued a Letter of Concern observing that existing stormwater monitoring and Best Management Practices did not adequately address the presence of PFAS in stormwater on the property. Dkt. # 17 ("Danson Decl."), at ¶ 14, Dkt. #17-5. On March 25, 2025, Ecology formally requested ESD to remove large volumes of contaminated soil from bioretention planters and then determine whether 'first flush' samples in September show the presence of PFAS in stormwater. Dkt. # 26-5 at 5–6.

The gravity of ESD's PFAS problem is captured in a lawsuit initiated by ESD in April 2025 against the contractor that installed the bioretention planters, in which ESD admits that the "testing showed PFAS concentrations exceeding the federal Maximum Contaminant Level ("MCL") and the Washington State Action Level ("SAL") at multiple locations at the [Madrona K-8], including in stormwater runoff from the bus loop, in soil located in the bus loop bioretention planters, and in the soil stockpile." Declaration of Ryen Godwin in Support of Plaintiff's Opposition to ESD's Motion for Summary Judgment ("Godwin MSJ Decl."), Ex. D. at ¶ 22.

Ecology's own internal communications in May 2025 confirm the seriousness those results. On May 9, 2025, Ecology staff described the Cedar Grove bioretention soil PFAS results from the Madrona sampling as a "big Uh-Oh." Godwin MSJ Decl., Ex. A at 3. Those same internal communications reflect Ecology's view that the issue was likely to become "a

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 6
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

bigger issue," prompting escalation for coordination across Ecology units and discussion with the Stormwater Technical Team and PFAS-focused workgroups. *Id.* at 2. Ecology also internally flagged potential broader implications beyond Madrona K-8, including concern that Cedar Grove bioretention/topsoil mix with elevated PFAS could be used as imported fill at other cleanup properties, increasing the risk the same issue could recur elsewhere. Godwin MSJ Decl. Ex. B. Clearly, neither the public nor the regulatory agency had a mechanism to evaluate the risk of PFAS at properties like the Madrona K-8 School in 2018. Notwithstanding the bioretention soil remediation, stormwater at the Madrona K-8 School continues to contain levels of PFAS chemicals that exceed the state and federal standards.

C.      **OVWSD Attempts to Engage ESD in Direct Discussions and Mediation**

After sampling confirmed that ESD's UIC wells posed an imminent threat to the Deer Creek Drinking Water Aquifer, OVWSD's General Manger, Bob Danson, reached out to ESD's director of capital expenditures, Taine Wilton, to outline OVWSD's concerns. Danson Decl., at ¶ 8, Dkt. # 17-4. OVWSD first detected PFAS in stormwater at the Madrona K-8 School in 2022. Danson Decl., at ¶ 6, Dkt. # 17-3. The discussions between ESD and OVWSD began cordial but quickly deteriorated because OVWSD did not follow ESD's urging not to report a PFAS release to the Ecology. Danson Decl. at ¶ 8, Dkt. # 17-4 at 3. After OVWSD notified the Washington Department of Health and Department of Ecology, ESD completely stopped communicating directly with OVWSD about PFAS in stormwater. Danson Decl. at ¶ 12. Through 2024 and 2025, Mr. Danson repeatedly reached out to the ESD to discuss the presence of PFAS in stormwater but the ESD failed to adequately address OVWSD's concerns. Danson Decl. at ¶¶ 13, 15–17, 21–22, Dkt. ## 17-6 to -8, -11.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 7
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

On December 17, 2024, OVWSD's counsel sent a letter to ESD's counsel explaining that PFAS contamination at Madrona K-8 threatened groundwater quality standards and requesting site access for OVWSD to conduct additional groundwater sampling. Danson Decl. at ¶ 19, Dkt. # 17-9. The letter made clear that OVWSD sought a cooperative solution and asked ESD to work jointly to investigate and mitigate contamination before more formal action was necessary. *Id.* ESD responded three days later, but again declined to propose any joint path forward, merely stating that Ecology had instructed ESD to conduct additional monitoring and source identification. Danson Decl. at ¶ 20, Dkt. # 17-10. Although ESD's letter promised that it would provide a substantive response to OVWSD's letter sometime after staff returned on January 6, 2025, no such response materialized. *Id.*

OVWSD raised its concerns publicly after receiving no substantive response from ESD to that point. On February 25, 2025, Mr. Danson attended an ESD Board meeting and delivered remarks explaining that PFAS-contaminated stormwater continued to drain into UIC wells threatening the Deer Creek Drinking Water Aquifer. Danson Decl. at ¶¶ 21–22, Dkt. # 17-11. He advised the Board that OVWSD had provided preliminary engineering for drainage alternatives that could immediately reduce the risk, but that none had been implemented. Mr. Danson also reported that OVWSD had been excluded from ESD's discussions with Ecology and urged the Board to direct staff to work collaboratively with OVWSD to address the contamination threat and avoid further conflict. *Id.*

Having made no progress with direct discussions with ESD, OVWSD sent ESD and federal and state regulators a notice of its intent to sue ESD under the SDWA on May 20, 2025, Dkt. 1-1, as required under 42 U.S.C. § 300j-8(b). The letter put ESD on notice that it, through

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 8
2:25-CV-04109-TLF

141152\292259\50486640.v2

the Madrona K-8 School's UIC wells were discharging PFAS into the Deer Creek Drinking Water Aquifer in violation of the SDWA. Dkt. 1-1 at 9–12.

On June 11, 2025, 22 days after receiving OVWSD's notice letter, ESD's counsel, Ms. Weinberg, responded to OVWSD's notice letter. Dkt. #18 ("Godwin Decl."), at ¶ 12, Dkt. #18-10. Ms. Weinberg's response outlined ESD's view that the dispute fell under the Water Service Agreement's mediation clause. *Id.* After OVWSD's June 11, 2025, response contesting that view, the parties met and conferred on July 2, 2025. Godwin Decl. at ¶ 14. Between July 7 and July 10, counsel for the parties exchanged emails regarding a suitable mediator, notwithstanding OVWSD's view that the mediation provision did not apply to its claims. Godwin Decl. at ¶ 15, Dkt. # 18-12.

On July 10, 2025, ESD's counsel confirmed that she was reviewing the list of proposed mediators. *Id*. at 2. On July 25, 2025, more than three weeks after proposing a list of mediators at the parties' conference, OVWSD had still not gotten a response from ESD as to an acceptable mediator, so OVWSD's counsel notified ESD's counsel that this lawsuit would be filed that day. Godwin Decl. at ¶ 16, Dkt. # 18-13 at 2–3. OVWSD's counsel reiterated that it was still willing to engage in mediation notwithstanding its intention to file the complaint. *Id*. ESD's counsel Mike Dunning responded that he and Ms. Weinberg would need to confer with their client regarding mediation in light of OVWSD's decision to proceed with litigation. *Id*. at 2. Instead of taking up OVWSD's offer to enter mediation, ESD's counsel on September 9, 2025, contacted OVWSD's counsel to arrange a conference regarding ESD's plan to file its previous Motion to Dismiss. Godwin Decl. at ¶ 18, Dkt. # 18-15 at 3.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 9
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

**D.**    **Recent Sampling Confirms PFAS from ESD Continues to Threaten Groundwater**

In the fall of 2025, ESD performed additional "first flush" and soil testing for PFAS as requested by Ecology. Godwin MSJ Decl., Ex. C. These samples show that PFAS continues to be present at the Madrona K-8 school at concentrations above the applicable MCLs and SALs. *Id.* at 8–11. These results underscore OVWSD's earlier concern that prompt coordination with OVWSD could have advanced efforts to identify the true source of the PFAS contamination, whereas ESD's decision to proceed without that collaboration has resulted in continuing PFAS detections and no apparent resolution of the source.

### III.    ARGUMENT

**A.**    **Legal Standard**

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 265 (1986).To defeat summary judgment, a party "must establish that there is a genuine issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A genuine issue of material fact as being one that is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). Summary judgment is not appropriate where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *Warren v. City of Carlsbad*, 58 F.3d 439, 442 (9th Cir. 1995) (summary judgment is not proper

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 10
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

where material factual issues exist). This Court must view the evidence in the light most favorable to the nonmoving party. *Gaines v. Haughton*, 645 F.2d 761, 769 (9th Cir. 1981). The court's function at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Accordingly, this Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party, here OVWSD. *Id.* at 255.

### B.   The Water Service Agreement Did Not Require Mediation Prior to Filing this Suit

As stated in ESD's motion, the question of whether a condition precedent to litigation exists is a matter of state law. Dkt. # 24 at 7 (citing *Pac. Home Improvement, LLC v. Rodriguez*, No. CV TDC-21-1788, 2022 WL 13956160, at *3 (D. Md. Oct. 21, 2022)). Washington follows the objective manifestation theory of contract interpretation, under which courts determine intent by focusing on the words the parties used, not their later litigation positions. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503–04, 115 P.3d 262 (2005). The Court's primary goal in interpreting contractual provisions, including alternative dispute provisions, is to ascertain the parties' intent at the time they executed the contract, not the interpretation being advanced during litigation. *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013).

ESD's motion paints a simplistic picture under which any claim that relates to water quality concerns and/or the nonendangerment standard must necessarily "relate to" the Water Service Agreement simply because the Water Service Agreement parrots Washington's nonendangerment standard. *See* Dkt. 24 at 13–15. ESD's argument misapplies Washington law and disregards the express scope of the Water Service Agreement.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 11
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

1.    <u>OVWSD's Claims Are Not Logically or Causally Related to the Water Service Agreement</u>

The Water Service Agreement provides:

> **D. Mediation/Arbitration Clause.** If a dispute arises from or relates to this Agreement or the breach thereof and if the dispute cannot be resolved through direct discussions, the parties agree to endeavor first to settle the dispute in an amicable manner by mediation administered by a mediator under JAMS' rules before resorting to litigation. The mediator may be selected by agreement of the parties. Following mediation, or a written agreement of the parties to waive mediation, any unresolved controversy or claim arising from or relating to this Agreement, the interpretation or application or breach thereof, shall be resolved through litigation. All fees and expenses for mediation shall be borne by the parties equally. However, each party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentation of evidence.

Dkt. # 9-1 at 4–5 (emphasis added). Admittedly, the phrase 'arising from or relating to' indicates a broader dispute resolution provision than those that encompass only disputes 'arising' from an agreement. *See, e.g., McClure v. Davis Wright Tremaine*, 77 Wash. App. 312, 314–5, 890 P.2d 466, 468 (1995). However, broad does not mean boundless. In the analogous context of deciding whether a plaintiff's tort claims were subject to a forum selection clause, the Ninth Circuit held that "[w]hether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract." *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988). In holding that the forum selection clause at issue applied, the Court reasoned, "Each of these claims relates in some way to rights and duties enumerated in the exclusive dealership contract. The claims cannot be adjudicated without analyzing whether the parties were in compliance with the contract." *Id*. Later, in *Yei A. Sun v. Advanced China Healthcare, Inc.*, the Ninth Circuit elaborated that a dispute is "related to" an agreement where it "has some *logical or causal* connection to the parties' agreement." 901 F.3d 1081, 1086 (9th Cir. 2018). Applying that standard, the court held that statutory claims that arose when the plaintiffs "entered into the agreements" and were therefore logically connected to the agreements. *Id. McClure* itself

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

confirms this broad-but-not-limitless understanding of alternative dispute clauses covering disputes that "related to" an agreement. There the Court wrote that the "term 'relating to' is sufficiently broad to include a claim for breach of fiduciary duty." 77 Wash. App. at 315. In such a claim, the plaintiff seeks to enforce duties that are logically and causally related to the contract because they would not exist without the contract, but they do not arise from the contract because the duties themselves are not contractual.

In sharp contrast, OVWSD's Safe Drinking Water Act claims have no logical or causal connections to the Water Service Agreement because if one imagines that the Water Service Agreement did not exist at all, the claims asserted in this suit would be exactly the same. *Manetti-Farrow, Inc.*, 858 F.2d at 514; *Yei A. Sun*, 901 F.3d at 1086. OVWSD is not seeking to deny water service to the Madrona K-8 School or to seek damages, which it would be entitled to if it believed ESD was in breach of the Water Service Agreement. OVWSD's claims are therefore logically and causally independent from the Water Service Agreement because they exist under federal law without regard for the parties' contractual arrangement whatsoever.

The specific language of the Water Service Agreement's mediation provision also dictates a narrower interpretation than the one offered by the defendant. Immediately after the portion of the provision that the ESD focuses on, the agreement continues, "Following mediation…, any unresolved controversy or claim arising from or relating to this Agreement, *the interpretation or application or breach thereof*, shall be resolved through litigation." Dkt. # 26-1 at 5. Because OVWSD is not asking the Court to resolve any dispute relating to the "interpretation or application or breach" of the Water Service Agreement, it is not the kind of claim that the Water Service Agreement contemplated could only be decided after mediation.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 13
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

2.    The Water Service Agreement Does Not Encompass
Endangerment Caused by Chemicals that Were Not Regulated
at the Time it was Formed

The Water Service Agreement predates any legal obligation to identify, test, or analyze PFAS in UIC Wells, so it could not have contemplated imposing on ESD obligations relating to potential harms caused by PFAS. *See* 86 Fed. Reg. 73131 (2021 Unregulated Contaminant Monitoring Rule for PFAS); U.S. EPA Analytical Method 16331 and Method 1621 (2024); 89 Fed. Reg. 32532-01 (2024 PFAS MCLs); 89 Fed. Reg. 39124 (CERCLA Hazardous Substance). The specific list of negotiated analytes that ESD monitors omit PFAS chemicals entirely. Dkt. 9-1 at 16–18. This omission is not surprising because there was no standard or analytical methodology for PFAS chemicals in 2018 to objectively evaluate their presence in drinking water. It was therefore impossible for the parties to allocate risk associated with an unknown, unquantifiable, and unregulated group of chemicals.

The negotiated list of analytes and their respective standards, incorporated by reference into the agreement, are specifically related to the scope of ESD's and OVWSD's legal obligations. ESD's attempt to read paragraphs III.B and III.C as imposing "entirely separate" duties of monitoring and nonendangerment, Dkt. # 24 at 17, runs headlong into the principle in Washington law that a "contract 'should be construed as a whole and, if reasonably possible, in a way that effectuates all of its provisions.'" *Bellevue Square, LLC v. Whole Foods Mkt. Pac. Nw., Inc.*, 6 Wash. App. 2d 709, 717, 432 P.3d 426, 430 (2018) (quoting *Colo. Structures, Inc. v. Ins. Co. of the W.*, 161 Wash.2d 577, 588, 167 P.3d 1125 (2007) (plurality opinion)). The provision requiring the ESD to meet the nonendangerment standard must be read in context with the monitoring plan, list of analytes, and standards that the parties agreed would "demonstrate that the Project on-site stormwater management approach *does not endanger the Qva regional aquifer*[.]" Dkt. 9-1 at 9 (emphasis added). This statement *only* makes sense if the parties understood that the *contractual* nonendangerment requirement imposed by Paragraph III.C was defined and circumscribed by the list of analytes that ESD was required

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 14
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

to monitor under Paragraph III.B. If the parties intended for that contractual nonendangerment requirement to be forward looking and responsive to changes in the applicable regulations, they would have included a process for amending the monitoring plan to account for contaminants like PFAS that were not regulated at the time the Water Service Agreement was entered into.

The Court should respect the parties' decisions about which analytes and regulatory standards are the subject of the Water Service Agreement, and which are not. It is a longstanding presumption in Washington law that contracts do not incorporate changes to the law made after a contract is formed. The general law in force at the time of the formation of a contract is a part thereof. *Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship*, 158 Wn. App. 203, 214, 242 P.3d 1 (2010). But courts have long been cautious against incorporating post-agreement changes to the law into contracts:

> It is a dangerous thing to read too many things into a contract that are not placed in the contract by the parties to it. Of course, it is the universal law that the statutes and laws governing citizens in a state are presumed to be incorporated in contracts made by such citizens, because the presumption is that the contracting parties know the law; but this is altogether a different proposition from reading into a contract conditions which are not a part of the law of the country, and are not necessarily within the contemplation of the parties to the contract when the same is executed.

*Leiendecker v. Aetna Indem. Co.*, 52 Wash. 609, 611, 101 P. 219 (1909). The parties here certainly could have overcome this presumption by using language as 'now known *or hereafter regulated,*' 'groundwater quality standards now known or as *hereafter adopted,*' or simply those analytes 'known or *unknown*.' These common drafting elements would clearly express an intent to apply the agreement prospectively to future, unknown conditions. The parties here, however, omitted this prospective language, and instead incorporated the terms of "WAC 173-218-070 through WAC 173-218-090" as they were known to the parties at the time. Dkt. # 26-1 at 4.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 15
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

3.    <u>ESD Does Not Show that the Water Service Agreement Incorporated Then-Unregulated Contaminants</u>

The ESD's arguments that the Water Service Agreement covers contaminants beyond those listed in Exhibit B are unconvincing. Dkt. # 24 at 16–17. ESD cites language in the agreement relating the parties' intent to "implement additional measures to safeguard against contamination and to take reasonable measures to monitor the potential for adverse impacts to the drinking water supply and to require proactive measures before harmful impacts occur" as support for its position. *Id.* at 16. But that language directly undermines ESD's assertion. No reasonable person would agree to a monitoring plan that addresses only a finite, known set of analytes, and call it a "reasonable measure" sufficient to safeguard against all chemicals that *might* be regulated in the future. Similarly, the implementation of "additional measures to safeguard against contamination" in no way suggests that the parties thought they were implementing a comprehensive agreement that encompassed *all* measures to safeguard the aquifer from unknown, unregulated, and unmeasurable contaminants.

ESD's claim that the Water Service Agreement's indemnification provision suggests a forward looking interpretation is similarly misguided. Dkt. 24 at 16–17. ESD conveniently ignores the fact that its indemnification obligation is limited to instances where OVWSD can prove that the harm is "proximately caused by the negligent acts or negligent acts of ESD… in constructing, maintaining or operating the Storm Water Drainage System." Dkt. # 26-1 at 4. The parties would not have limited ESD's obligation to indemnify OVWSD to negligent actions if the intent of the Water Service Agreement was to exactly mirror ESD's regulatory obligations, as ESD contends.

ESD further argues that the Water Service Agreement's nonendangerment provisions

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 16
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

must apply to PFAS because otherwise the language requiring it to "'comply with all conditions and requirements of the State Department of Ecology' would be rendered meaningless for any requirement that came into existence *after* 2018." Dkt. 24 at 17–18. ESD emphasizes that the parties "*did* contemplate compliance with Ecology's authorization of the UIC Wells." *Id.* at 18. But of course the parties expected ESD to follow its independent obligations to follow the law and the regulatory requirements imposed by Ecology. The purpose of the agreement was not to ensure that the ESD would follow the law; rather, it was to "implement *additional* measures to safeguard against contamination… and to require proactive measures before harmful impacts occur," i.e., measures above and beyond those the ESD was legally obligated to do. Dkt. # 26-1 at 3. The fact that ESD has a continuing obligation to follow the law is independent from its obligations under the Water Service Agreement. This lawsuit is about enforcing the SDWA; it is not logically or causally related to ESD's contractual obligations.

ESD's claim that Ecology's incorporation of certain requirements of the Water Service Agreement bears on the interpretation of the agreement is particularly unpersuasive. Contract interpretation seeks to ascertain the intent of the parties *at the time they formed the agreement*. *Hearst*, 154 Wn.2d at 503–04. The later actions of Ecology, a nonparty to the agreement, have no bearing on the question raised by ESD's motion.

C.     **OVWSD's Citizen Suit vindicating the Public's Interest in Clean Drinking Water is not Subject to the Mediation Provision in the Water Service Agreement**

For the reasons set forth in OVWSD's response to ESD's Motion to Dismiss, the procedural hurdles that ESD seeks to impose on OVWSD's citizens' suit are impermissible.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 17
2:25-CV-04109-TLF

141152\292259\50486640.v2

*See* Dkt. # 16 at 11–14. ESD's arguments to the contrary, Dkt. # 24 at 11–13, fail.

ESD claims that *Gilmer* stands for the proposition that citizens' suits can be subject to additional procedural requirements in light of its holding that statutory rights can be subject to arbitration provisions. *Id*. at 11. This conflates claims based on statutory claims where the benefits accrue to the plaintiff, like the age discrimination claim at issue in *Gilmer*, with citizens' suits where the plaintiff serves as "as a 'private attorney general' by directly filing a civil suit in federal district court" to compel compliance with federal law. *Hussey v. Total Env't Sols., Inc.*, No. 6:14-CV-2186, 2015 WL 7282073, at *2 (W.D. La. Nov. 16, 2015). Safe Drinking Water Act citizen suits, like similar suits under the Clean Water Act, are intended to benefit the public interest, rather than compensating the plaintiff for a violation of its narrow rights. The Supreme Court in *Gilmer* emphasized that an alternative dispute claim may not apply to a statutory right where Congressional intent "to preclude a waiver of a judicial forum" could be ascertained from the statutory text, "its legislative history, or an 'inherent conflict' between arbitration and the" statute's purposes. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991).

In the context of SDWA citizen suits, Congress manifested such an intent by carefully specifying the exact procedural prerequisites that must be followed before a citizens suit may be initiated. 42 U.S.C. § 300j-8(b). Citizens' suits brought pursuant to the SDWA are plainly separate from other claims that the plaintiffs have to vindicate their personal rights. 42 U.S.C. § 300j-8(e). Just as ESD sought to discourage OVWSD from reporting ESD's injection of PFAS into the Deer Creek Drinking Water Aquifer, Danson Decl. at ¶ 10, Dkt. 17-4 at 3, its argument that SDWA citizen suits can be held hostage to open-ended dispute resolution

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 18
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

clauses would result in discouraging would-be plaintiffs from reporting potentially harmful SDWA violations to state regulators pursuant to 42 U.S.C. § 300j-8(b)(1)(A)(iii). This is exactly the kind of "inherent conflict" between alternative dispute provisions and a statutory scheme that the Court in *Gilmer* recognized could be inconsistent with alternative dispute resolution clauses. 500 U.S. at 26. The persuasiveness of *Gilmer* is further undercut by the fact that it concerned an arbitration provision, and was thus interpreted in light of the "liberal federal policy favoring arbitration." 500 U.S. at 20. That policy is not implicated by the Water Service Agreement's mediation provision because no such federal or state policy exists.

The ESD's discussion of settlements of citizens' suits is similarly misguided. It is true enough that a purpose of the 60-day notice period is to provide defendants with the opportunity to come into compliance with the law before a suit is filed. Dkt. 24 at 13. There is no dispute that ESD was afforded that opportunity in this case. It is telling, then, that instead of seeking dismissal under *Gwaltney* because it has, in fact, ceased endangering the Deer Creek Drinking Water Aquifer, ESD instead is seeking to dismiss the case on a technicality. Presumably, it hopes it can offer OVWSD enough inducement in mediation that will cause it to drop its claims, while avoiding the embarrassment and regulatory attention brought by this litigation.

The ESD's reliance *Olympians for Public Accountability*, No. C09-5756BHS, 2011 WL 62147 (W.D. Wash. Jan. 7, 2011), and Columbia Riverkeeper *Kemira Chemicals*, No. 3:20-cv-06257, (W.D. Wash. June 15, 2021), are entirely inapt. ESD is correct enough when it states that the decision in *Olympians for Public Accountability* "discuss[es] the resolution of a prior notice of intent to sue under a citizen-suit provision via a private settlement contract," Dkt. #24 at 13, but it fails to mention that the court ultimately rejected the argument that the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 19
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

private settlement agreement barred the subsequent suit "because the notice requirements were met" by the plaintiffs in that case. 2011 WL 62147 at *4. Here too, OVWSD met the notice requirements to initiating a SDWA suit.

It is simply not true that settling Clean Water Act citizen suits is entirely a matter of private contract as ESD contends. Dkt. # 24 at 13. In fact, no consent decree may be entered in a Clean Water Act citizen suit that has not been reviewed by the Attorney General and the EPA administrator. 33 U.S.C. § 1365(c)(3). The settlement agreement in *Kemira* expressly spells out the steps that the parties would take to follow these requirements, and furthermore contemplated the possibility that the court, notwithstanding their private agreement, might "not enter the Order of Dismissal with Prejudice proposed by the Parties." *Columbia Riverkeeper v. Kemira Chems., Inc.,* No. 3:20-cv-06257, Dkt. # 19-1 at 5. The public's interests are protected in the context of the SDWA by the statute providing that the EPA "may intervene as a matter of right" in such suits. 42 U.S.C. § 300j-8(c). The government's statutory right to participate in the resolution of this dispute would be foreclosed if the case were dismissed to force a private mediation prior to litigation contrary to the SDWA.

**D.    ESD Waived its Right to Pre-Litigation Mediation by Refusing to Engage in Direct Discussions for Years and Failing to Schedule Mediation after Receipt of a Notice of Intent to Sue Letter under 42 U.S.C. § 300j-8(b).**

Under Washington law, rights under a dispute resolution clause may be expressly or impliedly waived. *Verbeek Props., LLC v. GreenCo Env't, Inc.*, 159 Wash. App. 82, 87, 246 P.3d 205, 208 (2010). Waiver occurs where the party asserting the right exhibits "conduct inconsistent with their right[s]." *Lake Washington Sch. Dist. No. 414 v. Mobile Modules Nw., Inc.*, 28 Wash. App. 59, 63, 621 P.2d 791, 794 (1980). Waiver of dispute resolution provisions

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 20
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

can be inferred from a party's conduct. *Shepler Const., Inc. v. Leonard*, 175 Wash. App. 239, 249, 306 P.3d 988, 993 (2013). If the mediation provision were enforceable, it was ESD, not OVWSD, who first repudiated it.

Before discussing mediation, the Service Agreement presumes that the parties will attempt to "resolve[] [their disputes] through direct discussions." Dkt. 9-1 at 5. Throughout years of OVWSD's attempts to engage ESD in discussions to address OVWSD's concerns over PFAS, ESD repeatedly refused to engage in direct discussions.

OVWSD first discovered PFAS in stormwater at ESD in the fall of 2022. In January 2023, Bob Danson, general manager of OVWSD, notified the ESD and requested ESD coordinate with the OVWSD on the appropriate response. After a cordial beginning, ESD directed OVWSD to keep the sample results secret from the public, withhold the results from OVWSD's regulatory agencies such as Department of Health, and declined to cooperate with OVWSD further on a solution. Danson Decl. at ¶ 10, Dkt. # 17-4 at 3. In September 2024, OVWSD's general manager emailed ESD's director of capital spending to request that OVWSD be included in discussions between ESD and the Department of Ecology and to have access to ESD's sampling plans. Danson Decl. at ¶ 17, Dkt. # 17-8 at 3. In a letter to Ecology's statewide UIC coordinator, ESD signaled its willingness to "work with the Department of Ecology," but stated in no uncertain terms that it "does not support the participation of OVWSD in meetings between ESD and Ecology." Dkt. # 18-4 at 2. It continued to state that "ESD will not agree to split its samples with OVWSD either." *Id.*

OVWSD reached out to ESD through counsel on December 17, 2024, to work collaboratively with ESD to address OVWSD's concerns about PFAS being injected to the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 21
2:25-CV-04109-TLF

141152\292259\50486640.v2

groundwater at the Madrona K-8 School. Danson Decl. at ¶ 19, Dkt. # 17-9. OVWSD received a preliminary response on December 20, 2024, but the "substantive response" promised in early January, Dkt. # 17-10 at 2, never materialized. In February 2025, Mr. Danson appeared and testified at an ESD public meeting to express OVWSD's frustration at not being meaningfully involved in ESD's efforts to address its PFAS issues. Danson Decl. at ¶¶ 21–22, Dkt. # 17-11. He submitted written comments that were provided to the ESD prior to the meeting. Mr. Danson's comments specifically implored ESD to coordinate with OVWSD to address the PFAS problem. *Id.* The ESD never responded to this request. Danson Decl. at ¶ 23. To the extent the Water Service Agreement applies to this dispute, ESD's express intent to exclude OVWSD from discussions regarding PFAS repudiate the requirement that the parties engage in "direct discussion" prior to mediation. Dkt. # 26-1 at 5.

When, on May 20, 2025, OVWSD provided ESD with the statutorily required notice letter pursuant to 42 U.S.C. § 300j-8(b), *see* Dkt. 1-1, it put ESD on notice that this lawsuit was imminent. ESD waited 21 days before responding on June 11 and informing OVWSD that it believed mediation was a condition precedent to this lawsuit. Godwin Decl. at ¶ 12, Dkt. # 18-10. OVWSD responded on June 24, 2025, stating that it believed ESD's conduct had rendered direct discussions futile. Dkt. # 18-11 at 3. Nevertheless, OVWSD agreed to meet to discuss ESD's claims. *Id.* The parties conferred on July 2, 2025, Godwin Decl. at ¶ 14, and a summary of that meeting from the following week shows that the parties agreed to participate in mediation. Dkt. # 18-12 at 3–4. On July 8, 2025, counsel for OVWSD indicated three mediators it would agree to use. *Id.* However, after a brief back-and-forth between the parties, ESD stopped communicating about mediation, despite its knowledge that this lawsuit was

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 22
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

imminent. *Id.* at 2. Despite providing assurances on July 10, 2025, that it was "looking into" the mediators suggested by OVWSD, ESD failed to confirm which of the mediators OVWSD suggested would be acceptable before the expiration of the 60-day notice period. Dkt. 18-12 at 2.[4] On July 25, 2025, OVWSD's counsel emailed ESD's counsel to notify them that OVWSD had filed the instant lawsuit. Godwin Decl. at ¶ 16, Dkt. # 18-13 at 2–3. In that email, OVWSD's counsel reiterated OVWSD's continued willingness to mediate and requested waiver of service. *Id.* Rather than continuing efforts to schedule the mediation, ESD battened the hatches and withdrew from discussions to schedule the mediation, opting instead to engage in motions practice. Godwin Decl. at ¶¶ 16–18.

ESD's long history of refusing to engage in direct discussions with OVWSD and its lack of urgency in scheduling a mediation after receiving OVWSD's notice letter are inconsistent the Water Service Agreement's requirement that the parties attempt to resolve disputes by "direct discussions" prior to mediation. Dkt. # 26-1 at 5. ESD's right to mediation, insofar as it existed, was therefore waived.

**E.    OVWSD Met Any Duty it Had to "Endeavor" to Mediate its Dispute With ESD Prior to Litigation**

Unlike many other alternative dispute provisions discussed in other cases, the Water Service Agreement's meditation provision does not provide any deadlines by which mediation must be scheduled and completed. *See, e.g.*, *Evox Prods. LLC v. Chrome Data Sols., LP*, 3:16-CV-0057-PK, 2016 WL 6518655, at *1 (D. Or. Aug. 31, 2016), *report and recommendation*

---

[4] ESD's primary counsel, Meredith Weinberg, did state that she would be out of the office from July 11 through July 25. However, her colleague Mike Dunning was made available during that period, and they were both well aware of the 60-day notice period. Dkt. # 18-12 at 4.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 23
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

*adopted*, 3:16-CV-00057-PK, 2016 WL 6496440 (D. Or. Nov. 1, 2016) (requiring that selection of mediator must be made "within ten (10) business days"). As shown by the record in this case, ESD has taken full advantage of this flexibility, having avoided even selecting a mutually agreeable mediator in the 60-plus days between receiving the notice letter and OVWSD's filing of the complaint in this case. The fact that the Water Service Agreement does not create a clear schedule for mediation does not mean, however, that OVWSD is required to indulge ESD's delay tactics indefinitely.

Under well-settled Washington law, "[w]here a contract is silent as to duration or states time for performance in general and indefinite terms, the court is to impose a reasonable time." *Pepper & Tanner, Inc. v. Kedo, Inc.*, 13 Wn. App. 433, 435, 535 P.2d 857, 859 (1975). Washington courts have recognized that forcing plaintiffs to engage in open-ended alternative dispute resolution processes without firm timelines creates inherent unfairness for plaintiffs and can, in some circumstances, be unconscionable. *Steven Burnett v. Pagliacci Pizza, Inc.*, 9 Wash. App. 2d 192, 216, 442 P.3d 1267, 1279 (2019), *aff'd sub nom. Burnett v. Pagliacci Pizza, Inc.*, 196 Wash. 2d 38, 470 P.3d 486 (2020) (holding arbitration agreement unconscionable where "the time required for compliance [with pre-litigation process] is not within the employee's control"). With these principles in mind, the Court should find that OVWSD afforded ESD a reasonable time to engage in mediation, fulfilling any obligation it had to "endeavor" to mediate prior to resorting to litigation. *See Seher v. Yarbor*, No. 2:25-CV-01089-LK, 2026 WL 381874, at *1 (W.D. Wash. Feb. 11, 2026) (parties jointly request 45-day stay for mediation); *Evox. Prods.*, 2016 WL 6518655, at *3 (recommending a 45-day stay to allow parties to mediate). The reasonableness of OVWSD's efforts to mediate are all the clearer because OVWSD has maintained its willingness to mediate. *See* Dkt.# 18-14 at 4. It was ESD's failure to promptly notify OVWSD of its demand to mediate and subsequent foot dragging that have resulted in a failure to mediate.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 24
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

**F.**     **A Stay, Rather Than Dismissal, Would be the Appropriate Remedy to Enforce the Mediation Clause**

ESD's Motion says little if anything about the appropriate remedy for an alleged violation of a mandatory mediation provision. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Smith v. Ascension Acquisition, LLC*, No. 2:24-CV-01987-LK, 2025 WL 296994, at *1 (W.D. Wash. Jan. 24, 2025) (alteration in original; citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). Contrary to the supposed "consensus" said to exist in ESD's motion, Dkt. # 24 at 7–8, "a mandatory mediation clause does not render a claim (which would otherwise require mediation) subject to dismissal. If the mediation clause applies, then the proper remedy is to stay that claim until mediation is completed." *Scheeler v. Canopy Holdings, LLC*, No. 22-CV-02417-DDD-NRN, 2023 WL 3819341, at *6 (D. Colo. June 5, 2023) (citing *United States ex rel. El Paso Glass Co., Inc. v. David Boland, Inc.*, Case No. 17-cv-02072-CMA-STV, 2018 WL 1566834 at *3 (D. Colo., March 30, 2018) (collecting cases)); *see also N-Tron Corp. v. Rockwell Automation, Inc.*, No. CIV.A. 09-0733-WS-C, 2010 WL 653760, at *7 (S.D. Ala. Feb. 18, 2010) ("courts routinely stay rather than dismiss the proceedings to allow for implementation of the agreed-upon dispute resolution mechanism…. [D]istrict courts are vested with discretion to determine whether stay or dismissal is appropriate.").

This Court has in other instances recognized that dismissal may be improper where it would subject plaintiffs to open ended dispute resolution processes whereunder the defendant "makes no commitment to address disputes or schedule nonbinding conciliation within a specified period" may be unconscionable under *Burnett*. *Skistimas v. Hotworx Franchising*

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 25
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

*LLC*, 3:23-CV-05974-DGE, 2024 WL 4545006, at *7 (W.D. Wash. Oct. 22, 2024). *Evox* is particularly instructive. Similar to the circumstances presented here, the plaintiff made attempts to mediate prior to filing suit and the defendant alleged the parties "were on track to mediate before [Plaintiff] chose to initiate litigation prematurely." 2016 WL 6518655, at *3. The magistrate held that "California law would allow, if not require, the issue of an order staying this action rather than dismissing it." *Id.*

In deciding which remedy is appropriate, a court, "in its sound discretion, must assess and balance the nature and substantiality of the injustices claimed on either side." *Id.* (quotation omitted). Here, the balance of harms weighs strongly against dismissal. On March 25, 2025, Ecology requested ESD to conduct additional stormwater sampling for PFAS, including a 'first flush' event after October 1, 2025. Dkt. 26-5. Samples taken since then have shown that environmental media at the Madrona K-8 school continue to contain PFAS above the regulatory limits. Godwin MSJ Decl., Ex. C. Dismissal of the action would, perhaps by ESD's design, make protecting the aquifer more difficult. On the other side of the scale, staying the case rather than dismissing it would not cause any unfair harm to ESD. OVWSD has been willing since at least July of 2025 to mediate this case with ESD, and it has only been ESD's recalcitrance that has prevented the mediation from happening.

If the Court determines that the mediation clause imposes a duty to endeavor to mediate that OVWSD has not adequately discharged, the Court should enter a short stay of the litigation to permit the parties to endeavor again to mediate OVWSD's Safe Drinking Water Act claims but preserve access court to seek any necessary judicial remedies to protect the Deer Creek Drinking Water Aquifer.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 26
2:25-CV-04109-TLF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2

## IV.    <u>CONCLUSION</u>

In conclusion, the ESD's Motion for Summary Judgment must be denied.

Dated this 6th day of April, 2026.

SCHWABE, WILLIAMSON & WYATT, P.C.

By:    */s/ David F. Stearns*
Ryen L. Godwin, WSBA #40806
Email: rgodwin@schwabe.com
David M. Hori, WSBA #56796
Email: dhori@schwabe.com
Connie Sue Martin, WSBA #26525
Email: csmartin@schwabe.com
David F. Stearns, WSBA #45257
Email: dstearns@schwabe.com
1420 5th Avenue, Suite 3400
Seattle, WA 98101
*Attorneys for Plaintiff*

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 27
2:25-CV-04109-TLF

141152\292259\50486640.v2

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of April, 2026, I electronically filed the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will notify all parties in this matter whose names appear on the service list as registered in the Court's CM/ECF filing system.

*/s/ David F. Stearns*
David F. Stearns, WSBA #45257

CERTIFICATE OF SERVICE - 1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

141152\292259\50486640.v2